1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JEREMY JEROME MCLAUGHLIN,              No.  2:19-cv-0141 DAD AC P

12                    Petitioner,

13          v.                              FINDINGS AND RECOMMENDATIONS

14   ROSEMARY NDOH,

15                    Respondent.

16

17          Petitioner is a California state prisoner proceeding pro se with an application for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on the petition which

19   challenges petitioner's 2013 conviction for kidnapping, assault with a deadly weapon, rape, and

20   oral copulation by force.  ECF No. 1.  Respondent has answered (ECF No. 10) and petitioner has

21   filed a traverse (ECF No. 12).

22                                BACKGROUND

23   I.     Proceedings in the Trial Court

24          A.  Preliminary Proceedings

25          Petitioner was charged in Sacramento County Superior Court with kidnapping for the

26   purpose of committing rape and oral copulation (Count One, Cal. Penal Code § 209(b)(1));

27   assault with a deadly weapon (Count Two, Cal. Penal Code § 245(a)(1)); rape (Count Three, Cal.

28   Penal Code, § 261(a)(2)); oral copulation by force (Count Four, former Cal. Penal Code

                                         1

§ 288a(c)(2)); and kidnapping (Count Five, Cal. Penal Code § 207(a)).  2 CT 592-95[1] (Amended Information) (ECF No. 11-2 at 233-36).  Counts Three and Four included enhancements for using a deadly weapon and tying or binding the victim.  Id.  Petitioner pled not guilty and not guilty by reason of insanity and two doctors appointed to examine defendant opined that he was legally insane when he committed the crimes.  1 CT 31 (ECF No. 11-1 at 48); 2 CT 421-22, 482 (ECF No. 11-2 at 78-79, 124).  The case proceeded to trial.

B.  The Evidence Presented at Trial

The jury heard evidence of the following facts.[2]

Victim Jane Doe dated petitioner, off and on, for over one year during which time Doe broke up with her previous boyfriend but petitioner remained with his wife.  After Doe and petitioner broke up, they remained friends and regularly engaged in sexual relations.  Doe also helped petitioner by babysitting his children while he worked.

During the evening on January 4, 2010, Doe went to petitioner's apartment to babysit his children.  When she arrived, the children were not there.  Petitioner asked Doe if she wanted to have sex, but she declined.  Petitioner seemed upset.

Doe went with petitioner to help him with a large item in the garage.  Once they got into the garage, petitioner pulled out two switchblades, holding one in front of Doe's face and the other behind her back.  He said he was in control.  He put duct tape around Doe's face and head, covering everything except her nose and eyes and he zip-tied her hands behind her back.  Petitioner produced a large duffel bag, locked Doe inside the duffel bag, and left the garage, leaving Doe on the floor of the garage in the duffel bag.  Approximately ten minutes later, petitioner moved the duffel bag containing Doe into a van.

About two hours later, petitioner returned to the garage, let Doe out of the bag, and removed the tape and cut the zip ties.  But he did not let Doe leave; instead, he forced her to sleep

---

[1]  "CT" refers to the Clerk's Transcript on Appeal, Volumes 1 through 4 (Lodged Docs. 1-4 (ECF Nos. 11-1 to 11-4)).

[2]  This summary is adapted from the opinion of the California Court of Appeal.  Lodged Doc. 11 at 2-3 (ECF No. 11-11 at 2-3); People v. McLaughlin, No. C075870, 2017 WL 4768461, at *1-2, 2017 Cal. App. Unpub. LEXIS 7246, at *2-3 (Oct. 23, 2017).  The undersigned finds it to be accurate.

with him in the back of his van in the garage.  He still had a switchblade, which he put on the bed.

The next morning, petitioner orally copulated and raped Doe in the van in the garage.

Stilled armed, petitioner took Doe back to his apartment, where they changed clothes. Petitioner then drove Doe to Foresthill as petitioner explained that they were going to live in an underground bunker he had built in the forest.

They arrived at a partially finished cinder block building built in a hole, and petitioner put Doe to work filling cinder blocks with dirt.  In the evening, petitioner took Doe in the car away from the bunker, saying they needed to get supplies and get her belongings from her home.

They stopped at the Taco Bell drive-through in Auburn.  When petitioner leaned out of the car to get their order, Doe bolted from the car and ran into the Taco Bell, where she asked for and received help.

C.  Outcome

On Count One, a jury found petitioner not guilty of kidnapping for the purpose of committing rape and oral copulation but guilty of the lesser included offense of simple kidnapping.  On Counts Two through Five, the jury found petitioner guilty of assault with a deadly weapon, rape, oral copulation, and kidnapping, with a determination that petitioner used a deadly weapon in the rape and oral copulation.  The jury did not find that petitioner bound the victim during the rape and oral copulation.

The same jury sat for the trial on petitioner's sanity plea but was unable to reach a verdict, deadlocking at a vote of eleven to one favoring a verdict that petitioner was insane when he committed the crimes.  After the mistrial on the insanity plea, petitioner elected to represent himself and withdrew his insanity plea.

D.  Sentencing

The trial court sentenced petitioner to a determinate term of five years for the first kidnapping conviction (Count One) and a consecutive one year and eight months for the second kidnapping conviction (Count Five).  4 CT 920 (ECF No. 11-4 at 21).  The court sentenced petitioner to a consecutive indeterminate term of fifteen years to life each for the rape (Count Three) and forcible oral copulation convictions (Count Four).  4 Ct 922 (ECF No. 11-4 at 23).

1   Finally, the court stayed sentencing for the assault with a deadly weapon (Count Two).  Id.  In

2   total, the court imposed a determinate term of six years and eight months, followed by an

3   indeterminate term of thirty years to life.

4       II.     Post-Conviction Proceedings

5           Petitioner timely appealed, and the California Court of Appeal reversed the conviction in

6   Count Five for kidnapping and struck the determinate term imposed for that conviction.  Lodged

7   Doc. 11 (ECF No. 11-11 at 20).  The judgment was otherwise affirmed as modified.  Id.  The

8   California Supreme Court denied review on January 10, 2018.  Lodged Doc. 13 (ECF No. 11-13).

9   Petitioner did not petition the United States Supreme Court for certiorari or file any state habeas

10  petitions.  ECF No. 1 at 2.

11          The instant federal petition was filed January 18, 2019.  ECF No. 1.  Respondent

12  answered (ECF No. 10) and petitioner filed a traverse (ECF No. 12).

13              STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

14          28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

15  1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

23          The statute applies whenever the state court has denied a federal claim on its merits,

24  whether or not the state court explained its reasons.  Harrington v. Richter, 562 U.S. 86, 99

25  (2011).  State court rejection of a federal claim will be presumed to have been on the merits

26  absent any indication or state-law procedural principles to the contrary.  Id. (citing Harris v. Reed,

27  489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a

28  decision appearing to rest on federal grounds was decided on another basis)).  "The presumption

4

1  may be overcome when there is reason to think some other explanation for the state court's

2  decision is more likely."  Id. at 99-100.

3      The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

4  principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

5  U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established

6  Federal law," but courts may look to circuit law "to ascertain whether . . . the particular point in

7  issue is clearly established by Supreme Court precedent."  Marshall v. Rodgers, 569 U.S. 58, 64

8  (2013).

9      A state court decision is "contrary to" clearly established federal law if the decision

10  "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529

11  U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state

12  court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

13  the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court

14  was incorrect in the view of the federal habeas court; the state court decision must be objectively

15  unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

16      Review under § 2254(d) is limited to the record that was before the state court.  Cullen v.

17  Pinholster, 563 U.S. 170, 180-81 (2011).  The question at this stage is whether the state court

18  reasonably applied clearly established federal law to the facts before it.  Id. at 181-82.  In other

19  words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 182.

20  Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is

21  confined to "the state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d

22  724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims

23  summarily, without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a

24  state court denies a claim on the merits but without a reasoned opinion, the federal habeas court

25  must determine what arguments or theories may have supported the state court's decision, and

26  subject those arguments or theories to § 2254(d) scrutiny.  Richter, 563 U.S. at 102.

27  ////

28  ////

5

DISCUSSION

I.     Claim One: Denial of Right to Be Present at All Critical Stages of Trial

     A.  Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that his rights were violated under the Sixth and Fourteenth Amendments when testimony was read back to the jury during deliberations while he was absent, and that he did not waive his right to be present during the read back. ECF No. 1 at 4. Petitioner contends the reading back of testimony to a jury is a critical stage in a criminal prosecution at which he has a federal constitutional right to be present. ECF No. 12.

Immediately after the jury retired to deliberate, the trial court asked: "Counsel, do you stipulate that if the jurors want read back or have any questions that I may send in the answer or send in the court reporter with read-back without us meeting here in open court?" 2 RT 192[3] (ECF No. 11-6 at 192). Counsel for both sides answered in the affirmative. Id. The jury later submitted the following request for readback:

> Cassandra's testimony under direct exam regarding placement of knife during intercourse – Morning of Jan. 5.
>
> Cassandra's testimony under cross exam regarding removal of shirt—and re-direct testimony regarding removal of shirt.

2 CT 586 (ECF No. 11-2 at 227).

The court notified counsel of the request and that the readback would take place the following morning. 2 CT 558 (ECF No. 11-2 at 199). Neither party objected. Id. The following morning, the reporter conducted the readback in the deliberation room. 2 CT 587 (ECF No. 11-2 at 228).

     B.  The Clearly Established Federal Law

The United States Supreme Court has recognized "the right to personal presence at all critical stages of the trial . . . [is a] fundamental right[] of each criminal defendant." Rushen v. Spain, 464 U.S. 114, 117 (1983); Kentucky v. Stincer, 482 U.S. 730, 745 (1987) (the Constitution guarantees a criminal defendant "the right to be present at any stage of the criminal proceeding

---

[3] "RT" refers to the Reporter's Transcript on Appeal, Volumes 1-3 (Lodged Docs. 5-7).

1   that is critical to its outcome if his presence would contribute to the fairness of the procedure").

2   The "privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a

3   shadow.'" <u>Stincer</u>, 482 U.S. at 745 (quoting <u>Snyder v. Massachusetts</u>, 291 U.S. 97, 106-07

4   (1934)).

5              C.  <u>The State Court's Ruling</u>

6        This claim was raised on direct appeal. Because the California Supreme Court denied

7   discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned

8   decision on the merits and is the subject of habeas review in this court. <u>See</u> <u>Ylst v. Nunnemaker</u>,

9   501 U.S. 797 (1991); <u>Ortiz v. Yates</u>, 704 F.3d 1026, 1034 (9th Cir. 2012).

10       The state appellate court ruled in pertinent part as follows:

11          *Defendant's Absence During Readback of Testimony*

12
13
14
15
16       Defendant contends the reading back of testimony to a jury is a critical stage in a criminal prosecution at which he has a federal constitutional right to be present. He asserts the trial court violated this constitutional right by not allowing him to be present for the jury readback. We conclude, as defendant concedes, that the California Supreme Court has held that jury readback is not a critical stage in a criminal prosecution, and the United States Supreme Court has not held otherwise.

17
18
19
20
21       Immediately after the jury retired to deliberate, the trial court asked: "Counsel, do you stipulate that if the jurors want read back or have any questions that I may send in the answer or send in the court reporter with read-back without us meeting here in open court?" Counsel so stipulated. Later, the jury requested a readback of Doe's testimony concerning the sexual offenses. The court notified counsel that the readback would take place the following morning, and no one objected. The following morning, the reporter did the readback in the jury room.

22
23
24
25
26
27       "[T]he right to personal presence at all critical stages of the trial" is a "fundamental right[] of each criminal defendant." (<u>Rushen v. Spain</u> (1983) 464 U.S. 114, 117 [78 L.Ed.2d 267, 272], fn. omitted.) However, the California Supreme Court has specifically rejected the notion that jury readback is a critical stage of the prosecution. (<u>People v. Cox</u> (2003) 30 Cal.4th 916, 963, disapproved on another ground in <u>People v. Doolin</u> (2009) 45 Cal.4th 390, 421, fn. 22; <u>People v. Ayala</u> (2000) 23 Cal.4th 225, 288; <u>People v. Horton</u> (1995) 11 Cal.4th 1068, 1120-1121; see also <u>People v. McCoy</u> (2005) 133 Cal.App.4th 974, 982-983.) The California Supreme Court's decisions are binding on us. (<u>Auto Equity Sales, Inc. v. Superior Court</u> (1962) 57 Cal.2d 450, 455.)

28

1

2

3

4

5

6

7

> Nevertheless, defendant argues that the jury readback outside his presence, and without his personal waiver, violated his right to be present at all critical stages of the prosecution.  In support, he cites precedent of the Ninth Circuit of the United States Court of Appeals. (See Turner v. Marshall (9th Cir. 1995) 63 F.3d 807, 815, overruled on other grounds in Tolbert v. Page (9th Cir. 1999) 182 F.3d 677, 685.)  But the Ninth Circuit recognizes that the United States Supreme Court has never held that jury readback is a critical stage of the prosecution.  (La Crosse v. Kernan (9th Cir. 2001) 244 F.3d 702, 708.)

> In any event, we reject defendant's contention based on the California Supreme Court precedent.

8  Lodged Doc. 11 at 7-8 (ECF No. 11-11 at 7-8).

9          D.  Objective Reasonableness Under § 2254(d)

10       The United States Supreme Court "has never addressed whether readback of testimony to

11  a jury is a 'critical stage[] of the trial' triggering a criminal defendant's fundamental right to be

12  present," La Crosse v. Kernan, 244 F.3d 702, 708 (9th Cir. 2001), and the Ninth Circuit has "held

13  broadly that the right personally to be present at a readback of testimony is not 'clearly

14  established' according to Supreme Court jurisprudence,"  Fisher v. Roe, 263 F.3d 906, 916 (9th

15  Cir. 2001), overruled on other grounds by Payton v. Woodford, 346 F.3d 1204, 1217 n.18 (9th

16  Cir. 2003) (en banc)).

17       In La Crosse, the petitioner alleged that "his right to be present during all critical stages of

18  his trial was violated when testimony was read back to the jury outside of his presence."  Id. at

19  704.  The Ninth Circuit held that, "[g]iven the divergence of opinion on this issue and the lack of

20  clear guidance from the United States Supreme Court, [it could not] say that the California court's

21  [denial of the claim] was contrary to or an unreasonable application of clearly established federal

22  law."  Id. at 708.  Five months later, in Fisher v. Roe, the Ninth Circuit found that the trial court's

23  readback of testimony without the knowledge or consent of the defendants or their attorneys

24  violated the defendants' right to be present.  263 F.3d at 915-17.  In so holding, the Fisher court

25  explicitly distinguished its holding from that in La Crosse, stating

26

27

28

> there is a critical and dispositive difference between LaCrosse and the present case: LaCrosse's attorney not only was aware of the readback procedure proposed by the judge, but the attorney was consulted by the court and agreed to the proposed procedure and stipulated that his client need not be present.  Here, of course, the

8

district court found that the readback occurred not only in the absence of the defendants and their lawyers, but without their knowledge and participation.  In short, they had been completely and unilaterally excluded from that part of the trial.  These distinctive facts demonstrate that <u>LaCrosse</u> does not provide us with the answer in this case.

<u>Id.</u> at 916.  The instant case is analogous to <u>La Crosse</u>.  In this case, both defense counsel and the prosecutor agreed in advance that readbacks could take place without their presence.  They were further notified of the jury's readback request and that it would take place the following morning and offered no objections.

Absent controlling United States Supreme Court authority, and in light of the Ninth Circuit's holding in <u>La Crosse</u>, the undersigned finds that the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, and petitioner is not entitled to relief.  <u>Wright v. Van Patten</u>, 552 U.S. 120, 125-26 (2008) (per curiam) (absent controlling Supreme Court authority, there can be no unreasonable application of clearly established federal law.

II.     <u>Claim Two: Insufficient Evidence to Support Rape and Forcible Oral Copulation Convictions</u>

A.  <u>Petitioner's Allegations and Pertinent State Court Record</u>

Petitioner alleges that there was insufficient evidence to show that the victim did not consent to the acts that formed the basis for the forcible rape and oral copulation charges, because the evidence showed that he reasonably believed the victim had consented.  ECF No. 1 at 4.

B.  <u>The Clearly Established Federal Law</u>

Due process requires that each essential element of a criminal offense be proven beyond a reasonable doubt.  <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  In reviewing the sufficiency of evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  If the evidence supports conflicting inferences, the reviewing court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that

resolution." <u>Id.</u> at 326.  "A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."  <u>Cavazos v. Smith</u>, 565 U.S. 1, 2 (2011) (per curiam).

   C. <u>The State Court's Ruling</u>

  This claim was exhausted on direct appeal, and the last reasoned state court decision is the opinion of the Court of Appeals.  That opinion is therefore the subject of review under § 2254(d).  <u>Ortiz</u>, 704 F.3d at 1034.

  The state appellate court ruled in pertinent part as follows:

> *Sufficiency of Evidence of Rape and Oral Copulation*
>
> Defendant contends the evidence was insufficient to support the convictions for rape and oral copulation because, specifically, the evidence established, contrary to the jury's verdicts, that defendant entertained a reasonable and good faith belief that Doe consented to the sexual acts.  We conclude that the evidence was sufficient to sustain the jury's verdicts.
>
> A. *Legal Principles*
>
> Consent is a defense to both the rape allegation and the oral copulation allegation in this case.  (Pen. Code, §§ 261, subd. (a)(2); 288a, subd. (c)(2)(A).)   At trial, defendant relied on what is sometimes termed "the reasonable belief in consent defense," or the "<u>Mayberry</u> defense" after <u>People v. Mayberry</u> (1975) 15 Cal.3d 143.  This defense differs from actual consent in that it "'permits the jury to conclude that both the victim and the accused are telling the truth.  The jury will first consider the victim's state of mind and decide whether she consented to the alleged acts.  If she did not consent, the jury will view the events from the defendant's perspective to determine whether the manner in which the victim expressed her lack of consent was so equivocal as to cause the accused to assume that she consented where in fact she did not.'"  (<u>People v. Rhoades</u> (1987) 193 Cal.App.3d 1362, 1367.)  "The reasonable belief defense derived from <u>Mayberry</u> is founded upon evidence showing the defendant acted under a mistake of fact sufficient to harmonize his assertion of consent with the victim's story that consent was lacking. [Citations.]"  (<u>Id.</u> at p. 1369.)
>
> The trial court instructed the jury with CALCRIM Nos. 1000 and 1015 that defendant is not guilty of rape or oral copulation if he "actually and reasonably believed that the woman consented to the [act]."  Ordinarily, this involves a determination of credibility and a question of fact—namely, the defendant's mental state.  (See, e.g., <u>People v. Coddington</u> (2000) 23 Cal.4th 529, 583, overruled on another ground in <u>Price v. Superior Court</u> (2001) 25 Cal.4th 1046, 1069, fn. 13.)  However, even if the jury concludes the defendant honestly believed that the victim consented, the jury must determine

whether that belief was reasonable under the circumstances. "[R]egardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable" (People v. Williams (1992) 4 Cal.4th 354, 361 (Williams).)

B. *Facts*

Defendant, who was married to someone else, and Doe had a preexisting relationship. They had been dating, but Doe broke up with defendant in September 2009, causing defendant to break down and cry. Even after that, they maintained what Doe referred to as a "friends with benefits" relationship, meaning they still engaged in sexual activities together. At first, they had sex about once a week, but it decreased after that because Doe was uncomfortable with the nature of the relationship.

In December 2009, defendant invited Doe for a Christmas meal, but Doe declined. After trying to negotiate with Doe to get her to accept the invitation, defendant eventually got angry. However, Doe assisted defendant late in December by babysitting his children while he was at work. Once or twice during that time, Doe and defendant had sex when he returned home from work.

On January 4, 2010, Doe went to defendant's apartment to babysit defendant's children, but she found that the children were not there when she arrived. Defendant asked Doe if she wanted to have sex, but she declined. Defendant seemed upset. Defendant asked Doe to go with him from his apartment to his garage unit located a few hundred yards away to help carry a large item. She went with him.

Inside the garage, defendant closed the door and pulled out two opened switchblades, holding one in front of Doe's face and the other behind her back. He told her that he was in control and was sick of what she was doing to him after all he had given her. He said he would hurt her if she caused any problems. She was terrified.

Defendant pulled a roll of duct tape from his car and instructed her to put tape around her head and cover her mouth. Doe pleaded with him, but he said she had pushed him too far. She began taping herself, but he became frustrated and took over, winding the tape around several times to cover all but her nose and eyes. She had trouble breathing. Defendant bound Doe's hands tightly behind her back with zip ties, hurting her.

Defendant pulled a duffel bag out of his car and told Doe to get inside the bag. She reluctantly complied. Defendant zipped up the bag and put three or four padlocks on the bag to lock the bag. Defendant put the bag, with Doe inside, on the concrete floor of the garage and dragged the bag up against a wall. He moved some plywood around, and one of the pieces hit Doe in the face.

After approximately 10 minutes, defendant placed Doe, still in the bag, in the back of his van, on the floor. Defendant used duct tape around the outside of the bag to restrict Doe further. He also patted

the bag, saying, "I love you, sweetie," which Doe found very creepy. He told her to try to fall asleep. Defendant left the garage. Still bound and taped up inside the bag, Doe had difficulty breathing and felt like she might die.

After about two hours, defendant returned to the garage. He opened the bag far enough for Doe's head to be outside of it. Eventually, defendant took the tape off Doe's face and told Doe that he was taking Doe to live in an underground bunker he had built in the forest. She said she did not want to go, but he replied that she had to. Defendant cut the zip ties and allowed her to move out of the bag to the bed in the back of the van, but he told Doe that they had to stay the night in the van. Doe tried to act as if she loved him because she was afraid he would put her back in the bag.

Defendant and Doe spent the night in the van. Doe wanted to escape, but defendant placed one of the switchblades next to him on the bed and he told her not to try anything "stupid." Defendant tried to cuddle with Doe, but Doe shrugged him off and went to sleep.

When Doe woke up the next morning, defendant was undoing the drawstring on her pants. He took off her pants and underwear and began performing oral sex on her. While defendant was removing her pants, Doe removed her sweatshirt, under which she was not wearing anything. Doe testified that they commonly engaged in oral sex when they were dating, but she did not want him to do it because she felt like his prisoner. She had her head turned to the side and did not make any noise. After about 10 minutes she felt some kind of painful cramp, so she pushed him off. Defendant took off his pants, got on top of her, and put his penis in her vagina. Again, Doe did nothing to indicate she was enjoying the experience. After about 10 minutes, defendant said, "Sweetie, what's wrong?" She indicated to him that she was not enjoying it. He got off her and put his pants on, mumbling that it was typical of her to use him.

Eventually, Doe and defendant left the garage and walked back to the apartment. Defendant was holding Doe's arm and had a pocket knife in his pocket. Doe told defendant that what happened in the van felt like rape. He answered that it was not rape and pointed out that she took off her sweatshirt. He was angry that she would suggest that it was rape. Later, in a pretext call, defendant said to Doe that he stopped because she said it felt like rape and that, "in all fairness, you were all for it at first."

Also in the pretext call, Doe indicated that defendant had a switchblade next to him in the van while he engaged in sexual activities. He said, "No, I moved it, so it was out of the way." And she responded that it was still right next to him.

C. *Analysis*

We will assume for the purpose of argument, without finding, that defendant honestly believed that Doe consented to the oral copulation.

After summarizing the evidence relevant to whether defendant reasonably believed that Doe consented to the oral copulation and intercourse, defendant argues: "In the context of the sexual relationship that [defendant] and Ms. Doe had pursued with one another during the several months after she broke up with him, it was reasonable for [defendant] to believe she consented to have sex in the van on January 5th.  This is true in spite of the fact that she had declined to have sex earlier that evening, and had endured several hours of maltreatment before it occurred.  As explained above, [defendant] and Ms. Doe had a history of engaging in sexual acts even when their relationship was rocky.  Given that history, it was reasonable for [defendant] to believe Ms. Doe consented to have sex absent a clear indication from her that she did not.  In fact, Ms. Doe conceded that he immediately stopped the act of intercourse that morning and got dressed when she told him she was not enjoying it."

This is an argument that defendant could and did make to the jury.  But on appeal he is arguing that the evidence was insufficient to sustain the conviction.  In other words, he is arguing that there was no substantial evidence that defendant's belief that Doe consented to oral copulation and intercourse was unreasonable.  To the contrary, the evidence of unreasonableness was substantial.

"The *Mayberry* defense has two components, one subjective, and one objective.  The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented . . . .  In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent." (<u>Williams</u>, <u>supra</u>, 4 Cal.4th at pp. 360-361, fn. omitted.)  Evidence of the defendant's state of mind may be circumstantial.  (<u>People v. Thomas</u> (2011) 52 Cal.4th 336, 355.)

"In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances.  Thus, regardless of how strongly a defendant may subjectively believe a person has consented . . . , that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a <u>Mayberry</u> instruction. [Citation.]" (<u>Williams</u>, <u>supra</u>, 4 Cal.4th at p. 361.)

In this case, defendant's argument fails because his belief Doe consented was not "formed under circumstances society will tolerate as reasonable." (<u>Williams</u>, <u>supra</u>, 4 Cal.4th at p. 361.)  Defendant taped Doe's face, bound her wrists, and shoved her into a bag for two hours.  She had difficulty breathing and feared for her life.  Defendant brandished a weapon, which Doe knew he had with him during the entire episode, and he threatened to use it.  He told her he was in control.  She declined his advances before going to the garage, and she shrugged him off in the van.  However, he forced her to sleep by his side, and he warned her not to do anything "stupid."  Then he began his sexual attack when she was asleep.  She was his prisoner, and he took advantage of that situation to orally copulate her and have intercourse with her.  The prior relationship and Doe's self-

preservationist instinct not to resist under these circumstances do not establish that defendant's belief in consent was reasonable.  Instead, his belief was morally reprehensible and indefensible.  The jury got it right.

Lodged Doc. 11 at 8-13 (ECF No. 11-11 at 8-13).

### D.  Objective Reasonableness Under § 2254(d)

Although the state court did not cite Jackson v. Virginia or explicitly apply the standard it prescribes, this court may not grant relief unless the state court's analysis was objectively unreasonable under Jackson.  See Early v. Packer, 537 U.S. 3, 8 (2002) (per curium) (state court need not cite or even be aware of governing United States Supreme Court precedent for AEDPA deference to apply).  Because the Jackson standard is itself deferential, the AEDPA creates a "double dose of deference."  Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011).  The question is not whether this court finds the evidence insufficient or that the state court made a mistake, but whether "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable."  Id. at 965.

In this case, the court of appeal presumed that petitioner had an honest belief that the victim consented to the alleged acts but, after viewing the evidence in the light most favorable to the judgment and considering all reasonable inferences in support of that judgment, found that there was substantial evidence that that belief was unreasonable.  The jury heard petitioner's theory that his belief the victim consented was reasonable and rejected in in the face of evidence of the conditions in which petitioner held the victim and his accompanying threats.  There is nothing objectively unreasonable in the conclusion that the verdict was not irrational.  Accordingly, the state court's resolution of the issue may not be disturbed by the federal court.  See Boyer, 659 F.3d at 964.

### III.  Claim Three: Consecutive Terms of Fifteen Years to Life Constitute Cruel and Unusual Punishment

#### A.  Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that consecutive terms of fifteen years to life are cruel and unusual

14

1   because the victim stated that petitioner acted like the intercourse was consensual and when she

2   said she was not enjoying the intercourse he immediately stopped, he had no prior criminal

3   record, and he was employed as a licensed vocational nurse prior to arrest.  ECF No. 1 at 5.

4                    B.   The Clearly Established Federal Law

5            The Eighth Amendment forbids the imposition of "cruel and unusual punishments."  U.S.

6   Const. amend. VIII.  The Supreme Court has held that "[a] gross disproportionality principle is

7   applicable to sentences for terms of years."  Lockyer v. Andrade, 538 U.S. 63, 72 (2003);

8   Rummel v. Estelle, 445 U.S. 263, 271 (1980) ("[T]he Eighth Amendment prohibits imposition of

9   a sentence that is grossly disproportionate to the severity of the crime." (citations omitted)).  Such

10  instances are "exceedingly rare" and occur in only "extreme" cases.  Andrade, 538 U.S. at 73;

11  Rummel, 445 U.S. at 272.  "[F]ederal courts should be 'reluctan[t] to review legislatively

12  mandated terms of imprisonment and 'successful challenges to the proportionality of particular

13  sentences' should be 'exceedingly rare.'"  Hutto v. Davis, 454 U.S. 370, 374 (1982) (quoting

14  Rummel, 445 U.S. at 272, 274).

15                   C.   The State Court's Ruling

16           This claim was exhausted on direct appeal, and the last reasoned state court decision is the

17  opinion of the Court of Appeals.  That opinion is therefore the subject of review under § 2254(d).

18  Ortiz, 704 F.3d at 1034.

19           The state appellate court ruled in pertinent part as follows:

20           *Cruel and Unusual Punishment*

21           Defendant contends the consecutive indeterminate terms of 15 years
             to life imposed for the rape (Pen. Code, § 261, subd. (a)(2)) and oral
22           copulation (Pen. Code, § 288a, subd. (c)(2)) violate the federal and
             state constitutional proscriptions on cruel and unusual punishment
23           because the punishment is disproportionate to the crimes.  The
             contention is without merit.
24
25           A. *Legal Principles*

26           A punishment violates the Eighth Amendment of the United States
             Constitution if it is "'grossly disproportionate to the severity of the
27           crime.'"  (Ewing v. California (2003) 538 U.S. 11, 21 [155 L.Ed.2d
             108, 117].)    A punishment may amount to cruel or unusual
28           punishment under article I, section 17 of the California Constitution
             if "it is so disproportionate to the crime for which it is inflicted that

                                    15

it shocks the conscience and offends fundamental notions of human dignity." (In re Lynch (1972) 8 Cal.3d 410, 424, fn. omitted.)  We construe our state constitutional provision separately from its counterpart in the federal Constitution. (People v. Carmony (2005) 127 Cal.App.4th 1066, 1085.)

To assess proportionality under the state proscription of cruel or unusual punishment, we (1) examine the nature of the offense and the offender, (2) compare the sentence with punishments for more serious offenses in the same jurisdiction, and (3) compare the sentence with punishments for the same offense in other jurisdictions. (In re Lynch, supra, 8 Cal.3d at pp. 425-427.)  The assessment is nearly identical under the federal proscription of cruel and unusual punishment, in which we analyze "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." (Solem v. Helm (1983) 463 U.S. 277, 292 [77 L.Ed.2d 637, 650].)

"In examining 'the nature of the offense and the offender,' we must consider not only the offense as defined by the Legislature but also 'the facts of the crime in question' (including its motive, its manner of commission, the extent of the defendant's involvement, and the consequences of his acts); we must also consider the defendant's individual culpability in light of his age, prior criminality, personal characteristics, and state of mind. [Citations.]" (People v. Crooks (1997) 55 Cal.App.4th 797, 806.)

B. *Procedural and Factual Background*

Because defendant used a deadly weapon when committing the sexual offenses, the sentencing provisions found in Penal Code section 667.61, subdivision (e)(3) (which was subdivision (e)(4) at the time of defendant's crimes (Stats. 2006, ch. 337, § 33)) applied, providing for an indeterminate term of 15 years to life for each of the two sexual offenses.  The trial court imposed those two terms consecutive to the determinate term for kidnapping and fully consecutive to each other. (Pen. Code, § 667.6, subd. (d).)

C. *Analysis*

Defendant focuses on the mitigating circumstances relating to him personally in making his argument that the 15-year-to-life consecutive sentences for rape and oral copulation were cruel and unusual.  He cites the probation report, which states that he has no prior criminal record, he was fully employed, and he was honorably discharged from the Navy after service in Iraq.  He also cites evidence from the trial on his sanity, which ended in a hung jury.  The doctors at that trial opined that he was legally insane when he committed the crimes.  They found evidence of major depressive disorder and posttraumatic stress disorder.  We conclude that, even considering these allegedly mitigating circumstances, defendant's crimes against Doe were of a nature demanding the harsh punishment imposed.

16

"'Our Supreme Court has emphasized "the considerable burden a defendant must overcome in challenging a penalty as cruel or unusual. The doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment. While these intrinsically legislative functions are circumscribed by the constitutional limits of article I, section 17 [of the California Constitution], the validity of enactments will not be questioned 'unless their unconstitutionality clearly, positively, and unmistakably appears.'" [Citation.]' [Citation.]" (People v. Sullivan (2007) 151 Cal.App.4th 524, 569.)

Here, defendant raped and orally copulated Doe while in possession of a deadly weapon. The California Legislature has determined that such conduct merits harsh punishment—an indeterminate term of 15 years to life for each crime. Defendant exhibited the weapon early in his crimes against Doe. In fact, at the beginning, he had two switchblades, holding one in front of Doe's face and the other behind her back, both menacing and fear-inducing acts, telling her he was in control. When he and Doe were in the van, he placed one of the switchblades on the bed next to him and told Doe not to try anything "stupid." With the switchblade within reach, he began his assault on Doe while she was asleep. As we noted before, any belief on his part that the rape and oral copulation were consensual was reprehensible under the circumstances he placed Doe in.

Defendant attempts to analogize his case to People v. Dillon (1983) 34 Cal.3d 441. In that case, the defendant was a 17-year-old high school student who shot and killed a man during an attempted robbery at a marijuana farm. (Id. at pp. 451-452.) A jury convicted him of first degree felony murder. (Id. at p. 450.) The high court there found that the sentence of 25 years to life violated the proscription of the California Constitution against cruel and unusual punishment. (Id. at p. 489.) The court stressed the defendant's age, lack of criminal record, immaturity, and the fact that the attempted robbery was the product of "youthful bravado." (Id. at pp. 482, 488.) In particular, the court focused on the fact that the shooting occurred when the defendant and one of his companions were surprised by the victim, who was guarding the plants and appeared suddenly through some bushes behind them aiming a shotgun at them. (Id. at pp. 482-483.) The court concluded that the defendant feared for his life, panicked, and fired the shots because of a situation from which he could not extricate himself. (Id. at p. 488.)

This case does not compare well to Dillon. While defendant had no prior criminal record, he was 28 years old when he committed these offenses, old enough to understand the gravity of what he was doing. There was no element of reacting to an unanticipated situation. Instead, defendant planned the crimes carefully and committed them over a long period of time. Defendant asserts that we must consider that psychologists in his inchoate insanity trial opined that he was suffering from some psychological difficulties when he committed the crimes. But he was unsuccessful in convincing a jury that he was insane when he committed the crimes. The facts, as we have

17

recounted them above, show the actions of a mature individual who carried out a meticulous and cruel plan to victimize his former girlfriend over a long period of time, including the two sexual offenses committed in the van, while using a deadly weapon. As the Legislature has determined, these crimes should be punished harshly.

Therefore, considering the nature of the sexual offenses, committed with a deadly weapon, and the nature of the offender who was a mature man and someone the victim should have been able to trust, the motive, manner of commission, extent of the defendant's involvement, and consequences of his crimes justify the two consecutive 15-year-to-life terms for rape and oral copulation while armed with a deadly weapon. (People v. Crooks, supra, 55 Cal.App.4th at p. 806.)

Defendant's arguments on the cruel and unusual punishment issue are without merit under both federal and state standards.

Lodged Doc. 11 at 14-18 (ECF No. 11-11 at 1984-88).

D. Objective Unreasonableness Under § 2254(d)

Petitioner has failed to demonstrate that this is one of the rare cases which supports an inference of gross disproportionality. The United States Supreme Court has held that a life sentence is constitutional, even for a non-violent property crime. In Rummel, the Supreme Court upheld a life sentence with the possibility of parole, imposed under a recidivist statute, for a defendant convicted of obtaining $120.75 by false pretenses, which was normally punishable by imprisonment for two to ten years. 445 U.S. at 265-66. In Harmelin, the Supreme Court upheld a mandatory sentence of life without the possibility of parole for a defendant convicted of possessing more than 650 grams of cocaine, even though it was his first felony offense. Harmelin v. Michigan, 501 U.S. 957, 961, 994-96 (1991). The crimes underlying the immediate conviction are obviously more serious than the ones at issue in Rummel and Harmelin, as this case involves sex offenses committed with a deadly weapon. Based on the foregoing, the court of appeal's rejection of this claim was not contrary to or an unreasonable application of Supreme Court precedent.

IV.    Claim Four: Trial Court Abused Its Discretion at Sentencing

A. Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that the trial court abused its discretion when it determined that Counts Three and Four (rape and forcible oral copulation) were separate offenses, leading to the

18

1  imposition of consecutive sentences on the two counts.  ECF No. 1 at 5.

2          B.  <u>The Clearly Established Federal Law</u>

3          Sentencing is governed by state law, and errors related to the application of state law do

4  not support federal habeas relief.  <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990) ("[F]ederal habeas

5  corpus relief does not lie for errors of state law." (citations omitted)).  A state sentencing error

6  violates a defendant's federal constitutional rights, and supports habeas relief, only where the

7  error is "so arbitrary or capricious as to constitute an independent due process or Eighth

8  Amendment violation."  <u>Richmond v. Lewis</u>, 506 U.S. 40, 50 (1992).

9          C.  <u>The State Court's Ruling</u>

10          This claim was exhausted on direct appeal, and the last reasoned state court decision is the

11  opinion of the Court of Appeals.  That opinion is therefore the subject of review under § 2254(d).

12  <u>Ortiz</u>, 704 F.3d at 1034.

13          The state appellate court ruled in pertinent part as follows:

14          *Consecutive Sentencing*

15          Defendant also contends that the trial court abused its discretion by
            imposing fully consecutive indeterminate terms for the two sexual
16          offenses.  To the contrary, imposition of consecutive sentencing was
            well within the discretion given to the trial court.
17

18          The trial court must impose a "full, separate, and consecutive term"
            for rape and oral copulation "if the crimes . . . involve[d] the same
19          victim on separate occasions." (Pen. Code, § 667.6, subd. (d).)  That
            statute supplies the standard for the trial court to apply: "In
20          determining whether crimes against a single victim were committed
            on separate occasions under this subdivision, the court shall consider
21          whether, between the commission of one sex crime and another, the
            defendant had a reasonable opportunity to reflect upon his or her
22          actions and nevertheless resumed sexually assaultive behavior.
            Neither the duration of time between crimes, nor whether or not the
23          defendant lost or abandoned his or her opportunity to attack, shall be,
            in and of itself, determinative on the issue of whether the crimes in
24          question occurred on separate occasions."  (Ibid.)  A momentary
            pause between crimes may be sufficient for a defendant to reasonably
25          reflect on his actions and then resume the assault.  (People v. King
            (2010) 183 Cal.App.4th 1281, 1325 [defendant had reasonable
26          opportunity to reflect when he saw lights of car driving by and
            momentarily paused to look around uneasily before resuming his
27          sexual assault].)

28          We may reverse a finding that the defendant committed offenses on
            separate occasions under Penal Code section 667.6, subdivision (d)

                                            19

"only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (People v. Garza (2003) 107 Cal.App.4th 1081, 1092.)

Here, the trial court stated it had discretion to impose consecutive or concurrent sentencing, and it imposed consecutive sentencing because the rape and the oral copulation, in the court's words, were "clearly two separate acts." The court added: "I can make it concurrent if I thought that it was appropriate. And I considered my discretion to make that concurrent, but I determined that the facts and the circumstances warrant that sentence run consecutive." Still later, after argument by defendant, the court said: "The factors determining consecutive [terms] were that they were separate offenses or separate intents separated by time."

Defendant argues that the trial court abused its discretion because the oral copulation and rape did not involve separate intents and were not separated in time. To the contrary, the facts supported the trial court's determination.

Defendant, armed with a switchblade, orally copulated Doe until she pushed him off. At that point, defendant removed his pants, got on top of Doe, and raped her. Having been pushed off and with his pants still on, defendant "had a reasonable opportunity to reflect upon his . . . actions" before resuming the sexually assaultive behavior. (Pen. Code, § 667.6, subd. (d).) Therefore, under the statutory standard, a fully consecutive term was appropriate.

In making his contention that imposing fully consecutive terms was an abuse of discretion, defendant fails even to mention the statutory standard in Penal Code section 667.6, subdivision (d), quoted above. Instead, he argues that we should apply a Supreme Court case interpreting the "single occasion" rule as it relates to a part of Penal Code section 667.61 now repealed. (People v. Jones (2001) 25 Cal.4th 98, interpreting Pen. Code, § 667.61, former subd. (g).) In that case, which involved interpretation of the term "single occasion," rather than "separate occasions," the Supreme Court declined to apply the statutory definition of the latter phrase found in Penal Code section 667.6, subdivision (d), because both the wording and the circumstances of application were different. (Id. at pp. 105-107.) Accordingly, the opinion in that case, interpreting a different term used in a different statute, is not persuasive in this case. That statutory standard prevails.

Lodged Doc. 11 at 18-20 (ECF No. 11-11 at 18-20).

D. Objective Unreasonableness Under § 2254(d)

The court of appeal's determination that the rape and forcible oral copulation constituted "separate occasions" within the meaning of California law is a matter of state law interpretation and this court is bound by its holding. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We

20

1    have repeatedly held that a state court's interpretation of state law, including one announced on

2    direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."

3    (citations omitted)); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (habeas relief "is

4    unavailable for alleged error in the interpretation or application of state law"); Miller v. Vasquez,

5    868 F.2d 1116, 1118-19 (9th Cir. 1989) (declining to address "[w]hether assault with a deadly

6    weapon qualifies as a 'serious felony' under California's sentence enhancement provisions

7    [because it] is a question of state sentencing law").  There is no indication that the state court's

8    decision was arbitrary or capricious, as the court of appeal carefully considered the facts of the

9    case and the applicable state law before coming to its conclusion that the two offenses constituted

10    "separate occasions."  Accordingly, petitioner does not present a cognizable basis for federal

11    habeas relief even if the state court misapplied California law.  Christian v. Rhode, 41 F.3d 461,

12    469 (9th Cir. 1994) ("Absent a showing of fundamental unfairness, a state court's misapplication

13    of its own sentencing laws does not justify federal habeas relief." (citations omitted)).

CONCLUSION

15         For all the reasons explained above, the state courts' denial of petitioner's claims was not

16    objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).

17         Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas

18    corpus be DENIED.

19         These findings and recommendations are submitted to the United States District Judge

20    assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days

21    after being served with these findings and recommendations, any party may file written

22    objections with the court and serve a copy on all parties.  Such a document should be captioned

23    "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

24    he shall also address whether a certificate of appealability should issue and, if so, why and as to

25    which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed

26    ////

27    ////

28    ////

21

within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 2, 2024

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE